# Samuel *vs* Samuel's Administrator, heirs and creditors.

CHANCERY.

APPEAL FROM THE FRANKLIN CIRCUIT.

*Case* 49.

*Wills. Trusts and Trustees.*

JUDGE MARSHALL delivered the opinion of the Court.

October 27.

BY the first clause of the will of Isham Talbott, made in 1837, he devised all his estate, real, personal and mixed, to three Trustees, or any one of them that might act, in trust for the purposes thereinafter mentioned, "with full power and authority, in their discretion, to sell and convey any of his estate, and to manage and control the same in any manner which they might think most conducive to the interest of his estate;" and after bequeathing several specific legacies of stock and money, directing payment of his debts and requiring his Trustees always to reserve in their hands a sum amply sufficient to support, genteelly and comfortably, an unfortunate daughter, to whom, if she should ever recover her reason, the testator gives a share of his estate equal to that of each of his other children, to be made up by contribution out of their parts—he, in the last clause, after reciting the amount of advancements made to three of his children, directs his Trustees "in finally settling up and adjusting and paying over the amount of the proceeds of his estate, to bring into computation the amounts aforesaid, as chargeable against each of said children, and then finally to distribute, after payment of all the charges, legacies, debts," &c. among the same three children, "all sums of money as shall belong to said estate."

Among the three residuary legatees was Mrs. Juliett M. Samuel, then the wife of Churchill Samuel, and so named in the will. There was also another married daughter and a son. In January, 1840, after, the residuary legatees, or the husbands of the females, with the male legatee, had allotted among themselves certain lands, part of the estate of the testator, at specific prices.

Case stated.

SAMUEL
*vs*
SAMUEL'S AD'S.
HEIRS, &c.

Peter Dudley, the only acting Trustee and Executor, in pursuance of that arrangement, executed, in that character, a deed, conveying to Churchill Samuel, upon the recited consideration of $8000, a tract of 406 acres of land in Carroll county, a part of the testator's estate, "to be valued, (as the deed says,) at $8000." The right, title and interest in one half of a house in Frankfort is also conveyed, "to be valued at $400;" and after excluding any personal responsibility of the Trustee in case of loss of the 406 acres, the deed imposes, in case of loss, a special responsibility upon the estate of the testator, so that redress should be sought against "*the heirs* of the testator to whom the Trustee may have conveyed or paid other estate of the testator," and not against the grantor, "who, (as it states,) has made this deed in execution of the trust only, conferred on him by the will of the testator."

A writing of even date with this deed was executed by Samuel to the Trustee, acknowledging the receipt of a conveyance of the tract of land in Carroll county, valued at $8000; of the right and title in one half of the house, &c. in Frankfort, valued at $400, and also two quarter sections of land in Arkansas, valued at $3800, "amounting in the whole, (as the receipt says,) to $12,200, on account of my, (Samuel's,) interest as one of the legatees of said Isham Talbott."

About eighteen months after the date of these writings, Churchill Samuel died indebted beyond the value of his whole estate, and his administrators having filed a bill, under the statute, for a settlement, and for a sale of his real and personal estate, claimed, as a part thereof, all the lands referred to in said receipt; and the deed from the Trustee to Samuel not having been recorded nor so acknowledged as to allow of its being admitted to record, they make the Trustee a party and pray for an acknowledgment of the deed. *Mrs. Juliett M.* Samuel, the legatee, having been also made a party, as interested in the real estate of her husband, she, by a cross bill against the complainants, the Trustee, her children as the heirs of C. Samuel, and other parties, alledges, that said conveyance, by the Trustee to her late husband, was made

in violation of the trust, without other consideration than her interest as legatee, and without her consent; and that her husband was well apprized of the will of her father and of the trust therein created, and claiming the title to be held in trust for her if it passed by said deed, she prays for a conveyance of the land to her.

The answer of the Trustee admits, in effect, the facts and claim set up in this cross bill. He states that he received no consideration from Samuel but the receipt, and that the conveyance was intended as an execution of the trust confided to him by the will, and to pass the interest of Mrs. Samuel in so much of her father's landed estate, and, as he supposed, for her benefit. The evidence confirms the material facts stated in the cross bill and in this answer; and indeed they are sufficiently established by the documents themselves, which show that there was no sale; no actual conversion of the land into money; no consideration for the deed but the receipt therefor as so much of the legacy left by Talbott's will to his daughter, and that the conveyance was but a distribution, *pro tanto*, of the land of the testator instead of converting it into money and distributing the money. The testimony, as already stated, shows, that this was done in pursuance of an arrangement to which it is not shown that Mrs. Samuel consented, even if she could consent; and it appears by proof, were it otherwise susceptible of question, that Samuel, the husband, knew all the facts. All necessary parties were made to the cross bill, and the infant heirs of Samuel were regularly before the Court and defended by guardian *ad litem*.

Upon the hearing, the claim of Mrs. Samuel as to the 406 acres of land, was rejected, and she was allowed dower only therein, subject to which it was decreed to be sold, or rather the necessary steps for that purpose were directed to be taken, by laying off the dower. From this decree Mrs. Samuel has appealed, and the only question is, whether her interest and claim under the will of her father, destroyed, or to the extent of the acknowledged value of the land conveyed to her husband in satisfaction thereof, or whether the said lands are still held in trust for her. In solving this question two inquiries pre-

SAMUEL
vs
SAMUEL'S AD'S.
HEIRS, &C.

sent themselves: 1st. Does the will imperatively require a sale of all of the testator's lands, and thus fix upon them absolutely, the character of money, so that the Trustee could not, by virtue of his power under the will, and at his own option, distribute land as a part of the testator's estate, instead of its proceeds in money? And, 2d. Whether, although land be absolutely directed to be sold, so that the Trustee cannot, without the consent or election of the legatee, distribute land instead of money, the husband of the legatee has any powers, by virtue of his marital rights, to elect to take the land before it is converted into money, and therefore, before the legacy is actually payable, so as to defeat his wife's right by survivorship, both as to the legacy and the land. The first of these questions depends upon the true construction of the will; the second upon a proper ascertainment of the legal and equitable principles applicable to the marital relation, and especially to the interest of the husband in the *choses in action* of the wife.

I. Upon the construction of the will, it is manifest that as the first clause, vesting the entire estate in the Trustees, who were also made executors, gives them the largest powers, to control, manage, sell and convey the estate; so it gives to them the largest discretion as to the mode of control and management, and as to the question of sale and conveyance. By that clause there is no other limit put upon this discretion but that it shall be exercised for the benefit of the estate itself. The succeeding clauses show the specific objects of the trust, which are: 1. To pay debts and specific and pecuniary legacies. 2. To raise and reserve a sum for the support of the testator's insane daughter, which may be called an annuity. And, 3. To pay over the residue to his three children named in the last clause, regarding, with a view to equality among them, the advancements which had been made to each.

It is certain that no clause of this will, unless it is the last, furnishes any ground for the inference that the testator intended that his whole estate should be converted into money.

It might indeed be made a question on the whole will, whether the discretion of the Trustees to sell and convey

Questions arising on the case.

was not intended to be limited in the first place to such conveyances as they might deem necessary or advantageous, by way of exchange or compromise, to free the land from litigation; and in the second place to such sales as they might deem necessary or proper for raising funds to pay debts, legacies and the annuity; and whether the residuary clause was intened to pass any thing but the surplus of such funds as might remain after satisfying these purposes. If this were the true construction of the will, then as there would be no ground for supposing that the testator intended the whole of his estate to be converted into money, but this extent of the conversion would obviously be left discretionary with the Trustees, acting with a view to the objects referred to, it would follow that as there would be no disposition by the will of the uses of so much of the estate as was not actually converted into money, the part remaining unconverted, would be held in trust for the use of the same persons as would have been entitled if there had been no will; that is, the land remaining unsold would be held in trust for the heirs, and the personal estate not converted into money for the use of the distributees. In which case the conveyance now in question, not being founded on any consideration actually paid or promised, but having been made merely in consideration of the wife's interest as heir in her father's real estate, and as a transfer of a part of that interest, Samuel would have held the title subject to the original trust, for the benefit of all the heirs; or if the conveyance were made, as seems to have been done, in pursuance of a division and allotment among the heirs, with the sanction of the Trustee, he would have held it in trust for his wife alone, whose share had been conveyed to him; for as husband, he could have no claim or right to receive and hold the fee simple of his wife's land. And having paid no consideration, and being cognizant of the trust in the grantor, and that the conveyance was made merely in virtue of his wife's interest, he could not, upon equitable principles, hold it otherwise than as a Trustee for his wife, subject only to his own interest as husband, and as contingent tenant by the curtesy.

SAMUEL
*vs*
SAMUEL'S AD'S.
HEIRS, &c.

Where a will authorizes a sale and conveyance by executors, of real estate for particular purposes, and equal division amongst heirs, the husband of one of the heirs, who receives a conveyance to himself in fee, on no other consideration than the interest of the wife and with a knowledge of the powers of the executor, is a Trustee for the benefit of the wife.

SAMUEL
*vs*
SAMUEL'S AD'S.
HEIRS, &c.

The construction
of I. Talbott's
will bearing on
this case.

But we are inclined to the opinion that, according to the true construction of the will, no part of the estate was intended to be undisposed of; and that whatever might be the literal effect of the last clause, the whole will, taken together, shows that it was intended to confer upon the three residuary legatees the entire beneficial interest in the whole estate, subject only to the payment of debts, legacies and the annuity provided for by the testator, and subject to the power or the command to sell: For, 1st. The whole estate is vested, by the will, in Trustees, in trust for purposes thereinafter to be mentioned, which implies that the uses are all declared. And there is no declaration beyond the object of paying debts, specific legacies and the annuity, unless it be in favor of the three residuary legatees or devisees, for we leave the contingent provision for the insane daughter out of the case. 2d. If the first clause gives a power to the Trustees to convert the whole estate into money, then by their doing so, the residuary clause would literally *carry the whole,* after payment of the charges put upon it as above stated. And as there is no indication of an intention that the amount of the interest of the residuary legatees should be left to the discretion of the Trustees, the inference is, that the testator intended them to have the whole residuum, or if it should be supposed that the Trustees were bound to convert the whole, then the residuary clause literally carries all beyond what may be necessary for the special objects previously designated. 3d. The other legatees, with the exception of the insane daughter, could not possibly claim under the will, any thing more than is specifically bequeathed to them; and it is evident that no others are regarded in disposing of the residuum, except the three residuary legatees, and contingently, the insane daughter, between whom alone equality is designed to be produced, by contribution from the parts of the three residuary legatees.

But further, although there is nothing in the will, except the last clause, which expressly confers any interest upon the residuary legatees, yet there are several circumstances which tend to show that the testator contemplated a distribution of portions of the estate among those

who would be entitled before the final distribution direct- ed in the last clause: 1st. Although there is no direct evidence as to the total value of the estate, there is enough in the record to show that it must have been a large one. The first clause devises the estate, "wherever situated, of every character and description, real, personal and mixed, including debts, stocks and *choses in action.*" The last clause shows that Mrs. Samuel had received advances to the value of $9000, and the other two legatees an aggregate of near $14,000; the receipt of Samuel shows $12,200 more, which being by arrangement, it may be presumed that as much was then distributed to each of the other two, and it is not suggested that a final distribution has yet been made. Did the testator intend that these residuary legatees or devisees, the objects of his largest bounty, should receive nothing until the whole of this large estate should be settled up, every body else satisfied, and even the annuity provided for their unfortunate sister, and which might probably not terminate but with her life, be at an end? This is hardly probable. 2d. The words *final* and *finally*, used in the last clause, in reference to the payment and distribution therein spoken of, seem to imply that there should or might be previous acts of the same character. The direction in a preceding clause, that the Trustees should always reserve money amply sufficient to support the insane daughter, implies that they might put out of their hands all except so much as they should deem sufficient for the designated purpose; and the contingent provision for making that daughter equal, &c. by contribution out of the parts of the other children, implies that the others might have received their parts, except the reserved fund, while her annuity was still going on. And it may have been in reference to this state of things, when at the termination of the annuity, the Trustees might have nothing left but the reserved fund, and perhaps some surplus of money beyond what had been actually required for the payment of debts and other special charges, that the words "proceeds and money" were used in describing the fund to be finally distributed to the three residuary legatees. But as the entire surplus or residuum, beyond the specific charges,.

SAMUEL
*vs*
SAMUEL'S AD'S.
HEIRS, &c.

was intended to be disposed of, and there is no disposition of it, unless to these residuary devisees, the necessary implication arises that such previous distributions of it must have been made to them, as they alone had any interest in the residuum. And the question arises, whether, by force of the words "proceeds and money," used in designating the subject of the residuary bequest, the intermediate distribution must be understood as being directed to be made in money, or whether, under the large discretion given to the Trustees, they might not, at their election, distribute the estate as it exists at the time of distribution, regarding only the prescribed equality among the persons entitled.

Where there is no absolute or direct indication on the part of the testator, that lands be converted into money, and the proceeds distributed as money, and the husband of the devisee, and heir of the testator, receive a conveyance in fee on no other consideration than the interest of the wife in the landed estate of the testator, the husband will hold as Trustee for the wife.

If the particular mode in which we have accounted for the use of the words in question, be admissible, the discretion given to the Trustees to sell and convey, control and manage the estate, would not be necessarily disturbed by the last clause, and we should be inclined to the opinion that it was in their *discretion* to distribute the estate in kind; and consequently, that there being no direct and absolute indication of an intention on the part of the testator, that all of the estate should be converted into money, the land conveyed to Samuel, in virtue of his wife's interest, would be held in trust for her as being a part of the very thing which she was intended to have. But waiving this particular hypothesis as to the use of the words "proceeds and money," and conceding that they were used as descriptive of the entire interest or estate which the residuary legatees were to receive, still there is no peremptory direction to the Trustees to sell the whole, and there is no apparent motive for such a direction or intention, may it not then have been described as money in the residuary clause, not for the purpose of controlling the discretionary power of the Trustees, or of indicating an intention that the legatees should have nothing but money, but only because the testator may have expected that under the discretionary power of the Trustees, the estate would be converted into money? And will such an implied expectation, when there is no express command, and the distribution of the estate in kind, to those to whom the money is given, would not

SAMUEL
vs
SAMUEL'S AD'S.
HEIRS, &C.

violate any express provision of the will, furnish such evidence of an intention to convert the whole estate into money as to authorize a Court of Equity to regard it as money before it is actually converted? Or if, for some purposes, it would, under such circumstances, be regarded as a constructive or equitable conversion, would it be so regarded for all purposes, and especially for the purpose of authorizing the husband to take the land as if it were the money of the wife?

The doctrine of equitable conversion is, at best, extremely artificial; its basis is, that things agreed to be done are treated in equity as if actually done: but as the principle is stated by Story, (2 vol. sec. 1212,) they are so treated, for "many purposes," and therefore impliedly not for all purposes: and the Court does not "interfere to change the quality of the property as the testator has left it, unless there be some clear act or intention by which he has fixed upon it, throughout, a definite character as money or as land," (2 *Story's Equity*, sec. 1212–1214,) nor will equity consider things as done in this light in favor of every body, but only of those who have a right to pray that it might be done, sec. 792. It is said in *Powell on Devises*, page 63, that the new character must be decisively and absolutely fixed upon the property, and if the Trustees may convert it or not, there is no constructive conversion; and in *Newland on Contracts*, page 54 and 56, the same principle is laid down as deducible from the cases in which, so far as we have had an opportunity of adverting to them, we find no authority for applying to wills the principle of equitable conversion on the ground of mere inference or implication, unless of the most absolute and imperative character. We should have great doubts, therefore, whether, even if the residuary clause is to be understood as describing the whole residuum as money, and as being therefore based upon the supposition or expectation that the whole estate would be converted into money, this should be regarded as equivalent to an absolute command or direction to that effect, or as sufficient to stamp upon the land, until actually converted, the character of money; and if not to be so regarded, as the implication in favor of distributions

"The doctrine of equitable conversion is extremely artificial," and is not applied by the Chancellor to change the quality of property as the testator has left it, without a clear indication manifested to give it character as *money* or *land*

SAMUEL
vs
SAMUEL'S AD'S.
HEIRS, &c.

previous to the final one still results from the various circumstances before referred to, it would follow, that such intermediate distributions might, in the discretion of the Trustees, be made in kind, and that when so made, land distributed or divided out, could be regarded only as land, and the husband receiving it in right of his wife, would hold it as her land, and precisely in the same manner and on the same trusts as if she had been entitled to it by descent.

II. But supposing that the will clearly and decisively indicates the intention, that the testator's whole estate should be turned into money, is the land thereby so far impressed with the character of personalty as that the husband may, by conveyance from the Trustee, take the land of the estate before actual conversion, as so much money bequeathed to his wife, and hold it free from her right in it as he would do the money itself if the land had been actually sold and the proceeds paid over to him by the Trustee? If the right to the proceeds of land directed to be sold, which unquestionably gives the right to elect to take the land itself, and to go into equity to prevent an unnecessary sale of it, and to have a conveyance of it in kind, gives, as it would seem to do, an equitable interest in the land, then we should think it beyond doubt, that the husband could not, by his own mere will, elect to take the land as his own instead of the money which might arise from the sale of it, since this would be to deprive the wife of her interest in the real estate, not in the mode appointed by the will of her ancestor who has disposed of it, but in an unauthorized mode whereby her right of taking the money or the land in case of the death of her husband during her life, and before an actual conversion, would be defeated. The question, whether as the residuary legatee of money directed to be raised by the sale of land, has, in effect, the whole beneficial interest charged with the debts and legacies, and may claim, in equity, so much of the real estate as may not be necessary for meeting such charge, this interest should be deemed in respect to the residuary legatee as land in equity, has been decided in the affirmative in England in the case of *Roper* vs *Ratcliffe*, (9 *Mod.* 167,) and in the

negative by the Supreme Court of the United States in the case of *Craig* vs *Leslie,* (3 *Wheaton,* 563.) Conceding that this latter case should be taken as decisive authority upon the question, and conceding also what perhaps should not be conceded, that it goes to the extent of deciding, that the bequest of money, the proceeds of land directed to be sold, though it gives the right to take the land instead of the money, does not create any equitable interest in the land itself, which being vested in a wife; the husband could not, by his election, destroy. Still, we have seen no case which carries the doctrine of equitable conversion so far as to say, that the husband of such a legatee may, in virtue of his right to take the money if he can get it, take the land as money, and hold it as he would the money itself, free from all right and claim of the wife.

On the contrary, the right of taking the land instead of the money, is never vested as a right to take the land as if it were money, but as a mere right to take the land instead of the money. It is strictly an election: (2 *Story's Equity,* sec. 793, *Newland on Contracts,* 49, *Powell on Devises,* 71.) It is in effect a right to waive the conversion, and is regarded as a privilege, (*Craig* vs *Leslie, supra,* and 4 *Condensed Rep.* 337,) and the election is to be made by the person entitled to the thing in the character stamped upon it by the will, (*Same authorities,*) or as it is expressed by Newland, by the person absolutely entitled. What then is the right of the husband in regard to the *choses in action* of the wife? It is in law, not an absolute right or title to the thing itself, for if he does not reduce it to possession or do some equivalent act within his power, the thing survives to his wife. It is then only a conditional right, dependent on his reducing it to possession. In this case he had no right to the land but as a consequence of his right to the money, and had no right to the money, except to reduce it into possession, which was never done, and which might never have been done in his lifetime. Does this conditional right to the money entitle him to elect to take the land absolutely, instead of it?

SAMUEL
*vs*
SAMUEL'S AD'S.
HEIRS, &c.

At law the husband as a legatee of money to be raised out of land, has an interest in the money, cannot regard the land as money, and as a legacy in money.—

—And a legacy to be paid in money by the sale of land, is not payable until the land is sold.

At law there is no such thing as a constructive conversion of land into money, because the land has been directed to be sold and the proceeds are disposed of as money, but the land, until sold, remains in law, what is in fact, the land of the estate. At law then, the husband, whose wife is the legatee of money, to be raised by the sale of the land, has an interest only in the money, and cannot regard the land as money and seize it as the legacy of his wife, which he may reduce to possession if he can. A legacy to be paid out of the proceeds of land directed to be sold for that purpose, is not payable until the land is sold, and therefore, cannot be reduced to possession before that time, any more than if it were strictly a reversionary interest, dependent upon a future event.

The Chancellor will not aid the husband to reduce to possession the *chose in action* of the wife without regarding the interest of the wife and securing a settlement if she need it.

It is only in a Court of Equity that land directed to be converted into money, is considered as money before an actual conversion, and the husband can claim the benefit of a constructive conversion and the right to elect to take the land, only upon the principles which are established in a Court of Equity. But that Court will not help a husband to reduce into possession a legacy or other *chose in action* of the wife, though actually due, without regarding the interest of the wife and requiring a settlement, if she need it. In Equity too, the possession by the husband as Trustee, will not defeat the wife's right by survivorship; and it is matter of doubt and controversy among Chancellors of great reputation, whether the husband's assignment, for a valuable consideration, of his wife's reversionary interest in money or other personalty, would defeat her right if she survive before it comes into possession; and also whether a Court of Equity will allow her to defeat that right, even by consenting in Court to the assignment: (*Clancy on Rights*, 140 *to* 150.) A Court of Equity, moreover, although it admits a person who is entitled to money to be raised by the sale of land, or to land to be purchased with money, to elect before an actual conversion, to take the property in its then condition, does not deem a *feme covert* competent to make such election, (*Powell on Devises*, 71,) and especially in the case of money to be laid out in land for her, *Oldham* vs *Hughes*, (2 *Atkyns*, 453,) in which case the act *en pais*,

of husband and wife was deemed insufficient for this lat-
ter purpose ; and it cannot be doubted, that if Samuel had
come into equity praying either for a sale by the Trustee,
or for a conveyance of the land, the Court would have
regarded and preserved the right of the wife who must
have been a party.  Is it not then inconsistent with these
principles of a Court of Equity, to permit the husband,
without the consent of the wife, to take, for his own use, the
land held in trust for raising money for her, merely because
she might have received and thus have made his own the
money which would be produced by the sale if he should
be alive at the time the money should be thus realized?
If it were conceded that the husband could have assigned
this interest of his wife to a stranger for a valuable con-
sideration, and that out of regard for such consideration
a Court of Equity might sustain the assignment against
the surviving wife, which, upon the modern authorities is
doubtful, or if he might receive his wife's legacy from an
executor before it is due, and thus made it absolutely his
own ;  still these admissions do not reach the present case,
the substance of which is, that on one side the Trustee
holding the land in trust, to sell it and raise money, not
for the husband, but for the wife, acting in execution of
the trust, as he supposed, for the deed itself shows this,
conveyed the trust land to the husband instead of the
wife in discharge of so much of her pecuniary legacy,
payable out of the land and not then due, because the
land was not sold; and on the other side, the husband of
the legatee, as the sole consideration of this conveyance,
acknowledged satisfaction of so much of his wife's future
legacy, which was not his, because he had not reduced it
into possession, and which the Trustee could only dis-
charge either by a conveyance of the land to the wife or
by selling it and paying the money to her or her husband.

We say the legacy was not Samuel's because he had
not reduced it to possession, and it could not then have
been reduced, specifically, into possession; and we say
his obtaining the land, for it was not a reduction of the
legacy into possession, because, as was known both to
the grantor and grantee, the land was under a trust to
raise money for Mrs. Samuel, and it could not be relieved

SAMUEL
vs
SAMUEL'S AD'S.
HEIRS, &c.

Though land be
directed to be
sold and the mon-
ey paid to the de-
visee, a *feme co-
vert*, the husband
of the devisee
may not take a
conveyance of
lands, and there-
by deprive the

SAMUEL
vs
SAMUEL'S AD'S.
HEIRS, &c.
wife of her inter-
est therein.

from that trust during her life but by a sale, or by being conveyed to her. If Samuel had survived, in which case he would have been entitled to the pecuniary legacy, the proceeds of the land, he might have had the right to claim the land instead of the money. But when he took this deed he was not entitled, unconditionally, to the legacy, and therefore had no right to claim or receive the land in lieu of it; and as the acceptance of the deed was not a reduction of the legacy to possession, he held the title during his life in trust, and it is held by his heirs since his death in trust for the surviving wife.

In addition to these views, it would seem from the remarks of Sir Joseph Jekyl in the case of *Lechmere* vs *Carlisle*, (3 *P. Williams*, 218,) and those of *Mr. Newland*, (*page* 46–7,) that though land directed to be sold, it is not in equity necessarily regarded as converted until the time arrives when it should have been converted; and as the Trustee in this case certainly had discretion as to time, the land might, on this principle, be regarded merely as land until actually converted by sale; and as land it could not belong to the husband, by his own act, or by the joint act of himself and the Trustee otherwise than by actual sale.

Wherefore, the decree upon the cross bill of Juliett M. Samuel is reversed, and the cause is remanded with directions to decree a conveyance to her of the tract of four hundred and six acres of land in Carroll county, mentioned in her cross bill, to be made by the Trustee, Peter Dudley, and the heirs of Churchill Samuel.

*Owsley & Goodloe, Morehead & Reed* for appellant; *Harlan & Craddock and Monroe*, for appellees.